AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# United States District Court
### for the
### District of Columbia

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

BLACK AND SILVER SAMSUNG CELL PHONE, IMEI# OF 359702060533740 AND A BLACK UMC CELL PHONE, SERIAL #2014121827605

)
)
)
)
)
)

Case No. 18-339

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

A BLACK AND SILVER SAMSUNG CELL PHONE DIPLAYING THE IMEI# OF 359702060533740 AND A BLACK UMC CELL PHONE BEARING SERIAL #2014121827605, See Attachment A, incorporated herein.

located in the _____ District of _____Columbia_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Sections 922 (g)(1); 841(a)(1), (b)(1)(C); 924(c)(1) | Unlawful Possession of a Firearm; Unlawful Possession with Intent to Distribute Heroin; Using, Carrying, and Possessing Firearm During a Drug Trafficking Offense |

The application is based on these facts:

See Attached Affidavit.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Wayne P. Gerrish
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____telephone_____ *(specify reliable electronic means)*.

Date: ____12/17/2018____

City and state: Washington, D.C.

_____
*Judge's signature*

Robin M. Meriweather
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| BLACK AND SILVER SAMSUNG CELL PHONE, IMEI# OF 359702060533740 AND A BLACK UMC CELL PHONE, SERIAL #2014121827605 | ) ) ) |

Case No.  18-339

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____Columbia_____
*(identify the person or describe the property to be searched and give its location)*:

A BLACK AND SILVER SAMSUNG CELL PHONE BEARING IMEI#  359702060533740 AND A BLACK UMC CELL PHONE, SERIAL #2014121827605; see Affidavit and Attachment A, incorporated herein.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein

**YOU ARE COMMANDED** to execute this warrant on or before _____December 31, 2018_____ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Robin M. Meriweather_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   ___12/17/2018 0:00 am___          _____
                                                                                              *Judge's signature*

City and state:   Washington, D.C.                          _____Robin M. Meriweather_____
                                                                                     *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  18-339 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## **ATTACHMENT A**

*Property to be searched*

The electronic devices to be search are described as follows:

**Device A**:   a Black and Silver Samsung cell phone displaying the IMEI# of 359702060533740

**Device B:**   a Black UMX cell phone, Model MXC-550, Serial # 2014121827605

The Devices are currently located at the ATF Washington Field Division located at 90 K Street, Northeast, Washington, D.C.

## ATTACHMENT B

*Property to be seized*

1.        The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and the commission of firearms offenses, in violation of 18 U.S.C. § 922(g)(1), 924(c) (collectively, the target offenses), as described in the search warrant affidavit, including, but not limited to:

   a.  call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data establishing or documenting the commission of the target offenses;

   b.  Records and information identifying locations where Mr. Burnette traveled to before and after the commission of the target offenses, and in preparation for the target offenses;

   c.  Any and all records, documents, and materials pertaining to or showing a relationship between or among Ricardo Burnette, and any co-conspirators involved in the above referenced offense, including but not limited to photographs, videos, correspondence, text messages, emails, call logs, records, GPS data and telephone numbers to the actual cellular phone being searched;

   d.  Records and information relating to stash houses, firearms, purchasers and suppliers of drugs;

   e.  Any and all records, documents, and materials, documenting any proceeds from narcotics trafficking;

f.  Any and all records, documents, and materials, documenting the purchase, sale, or suppliers of firearms;

g.  evidence of who used, owned, or controlled the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

h.  evidence of software, or the lack thereof, that would allow others to control the Devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

i.  evidence of the attachment to the Devices of other storage devices or similar containers for electronic evidence;

j.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Devices;

k.  evidence of the times the Devices were used;

l.  passwords, encryption keys, and other access devices that may be necessary to access the Devices;

m.  documentation and manuals that may be necessary to access the Devices or to conduct a forensic examination of the Devices;

n.  photographs or video that would constitute evidence of a violation of the target offenses;

2

o. records or information related to obtaining, secreting, transfer, expenditure and/or the concealment of narcotics in violation of 21 U.S.C. § 841(a)(1), which would constitute evidence of one of the target offenses;

p. records of or information about Internet Protocol addresses used by the Devices; and

q. records of or information about the Devices' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A BLACK AND SILVER SAMSUNG CELL PHONE DIPLAYING THE IMEI# OF 359702060533740 AND A BLACK UMC CELL PHONE BEARING SERIAL #2014121827605, CURRENTLY LOCATED AT THE ATF WASHINGTON FIELD DIVISION AT 90 K STREET, NORTHEAST, WASHINGTON, D.C. UNDER RULE 41 | SW No. 18-339 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Detective Wayne P. Gerrish, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, two cell phones, currently in law enforcement possession (the "Devices"), as described in Attachment A, and the extraction from that property of electronically stored information as described in Attachment B.

2.      I have been a Task Force Detective with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) since 2008, and a sworn law enforcement officer for over nineteen years with the Metropolitan Police Department of the District of Columbia (MPD). I am currently assigned to the ATF Washington Field Division, High Intensity Drug Trafficking Area (HIDTA) group, which is tasked with investigating drug and firearm related crime.

3.      I have successfully completed numerous training programs hosted by ATF, MPD, and other federal law enforcement agencies and organizations. I have received specialized training in the investigation of federal crimes involving the trafficking of firearms and controlled substances. Further, I have participated in numerous drug and firearm trafficking investigations that resulted in the arrest and conviction of numerous subjects, the seizure of property and assets, and the seizure of controlled substances and firearms.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 922(g)(1); 21 U.S.C. § 841(a)(1) and § 841 (b)(1)(C); and 21 U.S.C. § 924(c)(1) have been committed by Ricardo Burnette.[1] There is also probable cause to search the Devices, further described below and in Attachment A, for the things described in Attachment B.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6.      The property to be searched is a black and silver Samsung cell phone displaying the IMEI# of 359702060533740, that is, the "Device A", and a black UMX cell phone, Model MXC-550, Serial # 2014121827605, that is, the "Device B" (collectively, "Devices").

---

[1] Mr. Burnette has been charged by indictment with these offenses in Cr. No. 18-CR-329 (BAH).

7.     The Devices are currently located at the ATF Washington Filed Division located at 90 K Street, Northeast, Washington, D.C.

**PROBABLE CAUSE**

8.     On October 30, 2018, at approximately 6:00 am, members of the MPDC /ATF Task Force and members of the ATF Special Response Team executed a DC Superior Court Search Warrant for firearms at 1308 ½ Delafield Place, Northwest, Washington, D.C. This investigation was in reference to Mr. Ricardo Burnette for possessing firearms as a convicted felon. Mr. Burnette was convicted in Washington D.C. of Attempted Possession with Intent to Distribute Cocaine in June of 1995 (Case # 1994FEL12100). ATF Special Response Team members arrived at the residence and announced via a megaphone "Occupants of 1308 ½ Delafield Place, this is the Police and we have a search warrant, open the door!" This was repeated several times and with no response, the members made a breached entry via the use of an armored tactical vehicle into the downstairs exterior bedroom door believed to be occupied by Mr. Burnette. Once the door was breached, the Special Response Team members ordered Mr. Burnette from the residence. Mr. Burnette complied, and was detained in the driveway. The residence was secured, photographed, and subsequently searched. Items recovered from the downstairs bedroom where Mr. Burnette was located include, but are not limited to:

a.     Weapons and weapons paraphernalia to include a 7.62 caliber assault rifle along with several  high capacity magazines loaded with 7.62 ammunition, a .38 caliber Smith and Wesson  revolver, a .380 caliber Baikal semiautomatic firearm, assorted rounds of ammunition, a gun cleaning kit, and three ballistic vests.

b.    Narcotics and narcotics paraphernalia to include approximately four grams of clear twists of  plastic that contained a tannish powder substance that field tested positive for opiates, one  hundred and twenty two assorted colored pills that field tested positive for MDMA, approximately twenty grams of a white compressed rock like substance that field tested positive for cocaine, razor blades, over one hundred unused ziplocs, several digital scales, false bottom containers, a sifter, and a pot with a spoon that had white residue.

c.    Mail mater displaying the name Ricardo Burnette and documents to include a Driver Learners Permit to Ricardo Burnette and a Social Security Card to Ricardo Burnette.

d.    The Devices listed in this affidavit in support of a search warrant.

9.    Your affiant knows through training and experience that the suspected narcotics recovered during the search warrant, coupled with the narcotics paraphernalia, to be amounts not indicative of personal use and are indicative of amounts for that of the intent to distribute narcotics.

10.    The Devices are currently in the lawful possession of the MPDC /ATF Task Force and stored at the ATF Washington Field Division. The Devices came into the MPDC /ATF Task Force's possession by being seized as evidence during the execution of the above-referenced D.C. Superior Court Search Warrant authorizing the seizure of firearms and other indicia such as cell phones. The Devices were then transported to the ATF Washington Field Division and entered into ATF Evidence awaiting this application in support of a search warrant to download the contents of the Devices.

11.    Based on your affiant's knowledge, training, and experience, and in the knowledge, training, and experience of other members of ATF, cell phones are tools of the

4

narcotics trade.    Narcotics traffickers communicate with customers, suppliers, and co-conspirators via cell phones.  Narcotics traffickers use cell phones to arrange meetings, request narcotics, take narcotics orders, and arrange for co-conspirators to obtain and distribute narcotics.  To avoid detection by law enforcement, drug traffickers commonly use more than one cell phone and often send text messages, rather than engage in oral communications.

12.    Cell phones used by narcotics traffickers contain valuable information and evidence relating to their narcotics trafficking.  Such information consists of, but is not limited to: call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data. This information can: (i) reflect the preparation for, arrangement of, and commission of the trafficking of narcotics; (ii) identify locations where narcotics traffickers traveled to before and after transporting or selling narcotics; (iii) reflect the ownership and use of the cell phones by the narcotics traffickers; (iv) document meetings and communications between narcotics traffickers, their customers, associates, and coconspirators; (v) reflect communications between narcotics traffickers and other individuals, discussing the trafficking of narcotics; (vi) reflect communications between narcotics traffickers and other individuals who may have assisted or provided support in the trafficking of narcotics; (vii) document or contain evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of narcotics relating to the trafficking of narcotics; and (viii) document or contain evidence of the purchase of items from the assets derived from the trafficking of narcotics.

13.    Last, in my experience, many cell phones have picture-taking devices on them. My law enforcement training and experience indicates that drug-dealers like to take pictures or

videos of themselves, their drugs, the money made from selling drugs, and the persons with whom they work, that is, with whom they sell drugs. Moreover, people who possess firearms also like to take pictures of themselves with firearms to prove ownership or possession of a particular firearm to their friends. They will use a camera, cell phone with a camera, tablets with a camera and or personal computers to photograph and store photographs of firearms or themselves holding the firearm and other criminal activity that they may be involved in. These pictures or videos are excellent evidence of illegal gun possession. Moreover, cell phones can contain communications relating to the acquisition of firearms by those who cannot possess firearms legally, including the transmission of photographs of firearms available for purchase, with accompanying price information.

14.     The execution of a search warrant on the Devices would allow law enforcement to, among other things: (i) identify communications relating to the trafficking of narcotics and communications evidencing the narcotics relationship between individuals; (ii) provide contact information regarding potential suppliers, customers, and distributors of narcotics; (iii) identify meeting locations for the potential commencement of drug transactions or acquisition of narcotics; (iv) identify photographs of narcotics and drug paraphernalia (including tools of the drug trade, such as firearms), members of the drug trafficking conspiracy, or items purchased with the proceeds of drug trafficking; (v) identify communications and electronic documentation of the use or acquisition of the firearms recovered in this case from Mr. Burnette's bedroom (v) identify communications regarding the use and entry into 1308 ½ Delafield Place Northwest, including, the payment for access to the property. All of the aforementioned information would constitute evidence of the commission of a narcotics trafficking offense in violation of 21 U.S.C.

§§ 841(a)(1), (b)(1)(C), and the commission of a firearms offense, in violation of 18 U.S.C. §§ 922(g)(1), 924(c) (collectively, the target offenses).

## TECHNICAL TERMS

15.   Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.   "Digital device," as used herein, includes the following three terms and their respective definitions:

1)   A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.   *See* 18 U.S.C. § 1030(e)(1).   Computers are physical units of equipment that perform information processing using a binary system to represent information.   Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)   "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.   Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.      "Wireless telephone" (or mobile telephone, or cellular telephone, or cell phone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities.  These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal

8

calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.      A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen.  Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

d.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations.  Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data

security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

       f.     "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

       g.     Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

       h.     The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and

international borders, even when the devices communicating with each other are in the same state.

i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely

identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.     "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.     "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet.  In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software.  A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network.  A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.   One aspect of P2P file sharing is that multiple files may be downloaded at the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

i.     When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software.  The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

ii.   Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

16.     Based on my training, experience, and research, I know that the Devices have capabilities that allow them to serve as, among other things, a wireless telephone, digital camera, portable media play, GPS navigation device, and a means to access the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offenses under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

17.     As described above and in Attachment B, this application seeks permission to search for information that might found within the Devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the items described in Attachment B will be stored in the Device(s) for at least the following reasons:

a.     Individuals who engage in criminal activity, including the commission of a narcotics trafficking offense in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and the commission of a firearms offense, in violation of 18 U.S.C. §§ 922(g)(1), 924(c), use digital devices, like the Devices, to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the Devices, documents and records

relating to their illegal activity, which can include logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and records of illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; and (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators.

b.      Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.      Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted

files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

18.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In

15

particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.	Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information,

configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.      I know that when an individual uses a digital device to  participate narcotics trafficking and/or a firearms offense, like the target offenses here, the individual's

devices will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The digital device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

19.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text.  Digital device users can also attempt to conceal data by using encryption,

which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

       e.      Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before

examination of the device.   Additionally, most smart phones and other mobile devices require passwords for access.   For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.   Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.   Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.   For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.      Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.   In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

g.    In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing the search warrant will employ the following procedures:

i.    The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

ii.   The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

22

20.     In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.   In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

### **AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT**

21.     Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## CONCLUSION

22.     I submit that this affidavit supports probable cause for a warrant to search the

Device described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

_____
Wayne P. Gerrish
ATF Task Force Detective
MPDC /ATF Task Force

*Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1*
*based on information communicated by telephone on this 17th day of December, 2018*

_____
ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE
FOR THE DISTRICT OF COLUMBIA